# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 5, 2013 Session

## STATE OF TENNESSEE v. BARRY SMITH, JULIAN KNEELAND, AND BARRON SMITH

**Appeal from the Criminal Court for Shelby County**
**No. 10-02543   John T. Fowlkes, Jr., Judge**

---

**No. W2011-02122-CCA-R3-CD  - Filed December 5, 2013**

---

The Defendants, Barry Smith, Barron Smith, and Julian Kneeland, were convicted by a Shelby County Criminal Court jury of eight counts of aggravated assault, Class C felonies; one count of reckless endangerment committed with a deadly weapon, a Class E felony; eight counts of reckless endangerment, Class A misdemeanors; and one count of aggravated criminal trespass, a Class A misdemeanor. *See* T.C.A. §§ 39-13-102, 39-13-103, 39-14-406 (2010).  The trial court merged the eight counts of reckless endangerment with the eight counts of aggravated assault.  Defendant Barry Smith was sentenced as a Range I, standard offender to five years for each aggravated assault conviction, one year for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction.  The court ordered two of the aggravated assault convictions to run consecutively and the remainder of the convictions to run concurrently, for an effective ten-year sentence.  Defendant Barron Smith was sentenced as a Range II, multiple offender to seven years for each aggravated assault conviction, three years for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction.  The court ordered two of the aggravated assault convictions to run consecutively and the remainder of the convictions to run concurrently, for an effective fourteen-year sentence.  Defendant Julian Kneeland was sentenced as a Range I, standard offender to four years for each aggravated assault conviction, one year for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction.  The court ordered two of the aggravated assault convictions to run consecutively and the remainder of the convictions to run concurrently, for an effective eight-year sentence.  On appeal, the Defendants contend that (1) the evidence is insufficient to support their convictions, (2) the trial court erred by allowing the jury to hear a 9-1-1 recording, and (3) the court erred in sentencing.  We affirm the Defendants' convictions except the aggravated assault convictions in Count 21, which we reverse and dismiss.  We vacate the judgments for the remaining aggravated assault and reckless endangerment convictions and remand the case

for entry of a single judgment for each aggravated assault conviction, noting merger of the reckless endangerment convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed and Dismissed in Part; Vacated in Part; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Paul Guibao (on appeal) and Samuel Lee Perkins (at trial), Memphis, Tennessee, for the appellant, Barry Smith.

Andre Bernard Mathis, Memphis, Tennessee, for the appellant, Barron Smith.

Marvin Earl Ballin (at trial and on appeal) and Richard S. Townley (on appeal), Memphis, Tennessee, for the appellant, Julian Kneeland.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Theresa Smith McCusker and Jose Francisco Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arose from an August 8, 2009 shooting during a family barbecue in which Erica Irby was injured. At the trial, Memphis Police Officer Terrance Wilson testified that he responded to a call on August 8, 2009, at 2:00 p.m. and that the scene was chaotic when he arrived. He found people coming from the house who told him a woman, later identified as Erica Irby, had been shot. He said that the injured woman came out of the house and showed him her wound in the buttocks area and that he called for an ambulance. He said that when he went into the house, he found bullet holes in different areas of the walls and that a few people were still there. He thought that about fourteen people came from the house but that a few men left the scene. He identified a photograph of the house where the shooting occurred and said it was in South Memphis behind a middle school. He requested more officers to respond after he saw the number of people coming from the house. He said the people told him that someone had shot at the house.

On cross-examination, Officer Wilson testified that he did not see Defendant Barron Smith on August 8, 2009. He said that he could have received the call regarding the shooting more than an hour after he started his shift at 2:00 p.m. and that he was unsure of the time. He thought he remembered listing fourteen victims but said more people were probably at

the house. He did not know if the victims were related and did not remember their names. He said they told him the nicknames of two men who shot at the house. He wrote the names of the victims, took statements from a couple of people at the scene, and submitted a report with the information the victims told him.

Officer Wilson testified that his name was listed as the reporting officer on the crime scene log, which usually listed everyone who came to the scene, but that he did not know why the ambulance personnel were not listed. He said he saw an ambulance arrive but did not see Ms. Irby get into or leave in the ambulance. He said that he saw Ms. Irby's wound, that there was a little blood, and that she had been grazed by a bullet. He did not remember if bullet holes were in the front wall or the outside walls but said he saw bullet holes in the inside walls.

Memphis Police Officer Thomas Ellis testified that he responded to the shooting with the Crime Scene Unit on the evening of August 8, 2009, to collect evidence and photograph the scene. He said that when he arrived, he spoke with the scene officer to obtain his information for the report. He identified two aerial photographs of the house, which was located in a residential neighborhood. He photographed the inside and outside of the house and collected and transported the evidence to the property room. He identified photographs of a spent 7.62 shell casing found in the street in front of the house, a spent shell casing near the sidewalk, and other spent shell casings outside the front of the house. He said bullet holes were on the outside of the house on the north side and inside the house. He identified photographs of bullet holes in a shutter on the front of the house, the front porch ceiling, the siding on the front of the house, and the north side of the house. He said that inside, he found bullet fragments, several bullet holes, and blood on the floor.

Officer Ellis testified that he found approximately thirty bullet holes inside the house. He said he found bullet holes in the interior walls, the photographs hanging on the walls, the hallway, the bedroom doors, and the walls and identified photographs of the holes. He said that inside the house, he collected five spent "7.62 times 39 Wolf" shell casings, three spent nine-millimeter Luger shell casings, and two bullet fragments and that he did not recover guns. He identified photographs of blood found on the floor. He said that outside the house, he collected six 7.62 shell casings in the street, two spent nine-millimeter Luger shell casings on the sidewalk in front of the house, a spent 7.62 shell casing in the front yard near the porch, and a spent nine-millimeter shell casing in the front wall of the house.

On cross-examination, Officer Ellis testified that he received the call at 5:40 p.m. and arrived at the scene at 6:00 p.m. but was unsure what time the shooting occurred. He was unsure what type of gun shot 7.62 bullets. He did not try to obtain fingerprints from the shell casings and was unaware if anyone attempted to find fingerprints on the casings after they

were taken to the property room. He said he went to the front room, the stairwell, and the bedroom and did not go through the entire house because he only photographed and collected what the investigator instructed.

Officer Ellis testified that he had never been to the house before and did not know how long the bullets had been there. He said he could not determine if the bullet holes were made by guns shot inside or outside the house. He said all the photographs he took of the bullet holes in the outside of the house were in the front.

Martha Ann Gray testified that she was home on August 8, 2009, preparing for a barbecue when the shooting occurred. She said that she was inside when she heard gunfire and that she saw the people shooting. She identified Defendant Barry Smith, also known as "Skinny," Defendant Barron Smith, also known as "Fat," and Defendant Kneeland as the shooters. She said Erica Irby, also known as "Shell," Faith, Tonya, Krissy, Pam, Tiffany, Chico, who was her brother, Mario, Gidget, and her nieces, nephews, and cousins, who were young children, were at her house that day. She said that when the shooting began, she looked out the window and that everyone ran into the house. She said she ran to a bedroom and attempted to hide. She said that the shooting lasted for ten or fifteen minutes and that during the shooing, she heard "hollering, bullets, people screaming, [and] bullets flying from every angle." She said that she called 9-1-1 when she was lying on the floor, that she was placed on hold and hung up, and that she heard others in the house calling 9-1-1. She said that she knew the Defendants because they had been to her house to play games, use the computer, and talk with her nephew, cousin, and sons and that the Defendants had eaten and stayed overnight at her house. She said she did not have a weapon and did not attack the Defendants.

Ms. Gray testified that the police and an ambulance came to her house after the shooting and that her niece Shell had been hit by a bullet and was treated. She said that she did not invite the Defendants to her house on August 8, 2009, and that they did not have permission to enter her house or to have a key to her house. She gave a statement to the police about the shooting, identified the Defendants in photograph lineups, and verified her signature on the lineups. She identified a photograph of her house and said the bullet holes pictured were not there the night before the shooting. She said the bullets found were not lying inside or outside her house before the day of the shooting. She identified the blood on the floor as Shell's and said it was not there before the shooting. She said that Shell, her sister Faith, her sons, her cousin Herman, her young nephew Cavion and another young child of a family friend, who were hiding in a dresser, her nephew Demario, and other children in the closet with Shell and "Tan" were all hiding in the bedroom with her. She said she was "scared to death" as she hid on the floor because she did not know if they were going to live. She said that everyone hid because of the shooting and that they had no warning the shooting

-4-

would occur. She identified a photograph of the front of her house from the day of the shooting and identified "Tasha's" baby carrier, which was still sitting on the front porch. She said Tasha was inside the house at the time of the shooting.

On cross-examination, Ms. Gray testified that the shooting occurred around 3:00 or 4:00 p.m. She said she was in the living room when she heard the first shot and walked toward the door. She said that after several shots, people started running into the house and that she ran to the bedroom. She said she never saw the shooter and never saw anyone with a gun. She did not see any of her family members with a gun. She said that she came to the courthouse with some of the people who were in her house the day of the shooting. She said that she saw them everyday and that they were family but that they did not discuss the case. She said her sister, Cynthia Gray, was at the house at the time of the shooting. She admitted that she did not see the shooters but heard other people call the shooters by name as they were running into the house away from the shots.

Erica "Shell" Irby testified that Martha Gray was her aunt and that she was at Ms. Gray's house on August 8, 2009, around 6:30 or 7:00 p.m. She said that between twenty and thirty people were there when she arrived, including Ethel Gray, Faith Harris, who was her mother, Tasha Gray, Cynthia Gray, "a lot of kids and a lot of adults." She said everyone was preparing for a barbecue, which was normal for her family.

Ms. Irby testified that when she was at the party, she was grazed by a bullet on the right side of her buttocks. She said that when she arrived, she and her friend Lashonda Gray went to the porch where Ethel Gray, Gidget Lanier, and Darryl Gray were sitting and that children were in the yard. She said that about ten people were outside, that she saw a silver car approaching the house, and that they all ran inside the house when they heard gunshots. She said that she heard more shots coming from the back of the house after she was inside and that she hid in the closet with her four-year-old godson, Joell, and her sister, Lantondra Harris. She said that she did not see from where the shots came or who was shooting when she was in the closet but that bullets came from everywhere. She said that Martha Gray, Ethel Gray, Herman, and a lot of young children hid in the same room with her and that she could not remember everyone in the room because there were so many. She said her uncle, Dale, was already in the house when the first shots were fired and that Martha Gray and her husband were in the kitchen.

Ms. Irby testified that the shooting stopped and that she tried to run from the closet through the living room. She said that when she was running, she heard another bullet and felt "something." She said her uncle was lying on the couch and told her to get down because shots were being fired. She said that she crawled back to the closet and that when her sister told her she was bleeding, she realized she had been shot. She said she was unable

to sit down as the shooting continued. She said that after she returned to the closet, she saw her cousin, Dercedes Gray, come from the back of the house toward the front.

Ms. Irby testified that she saw "Julian" and "Skinny" in the doorway shooting, identifying Defendant Kneeland as Julian and Defendant Barry Smith as Skinny. She said that she saw Kneeland using a silver and black gun and that he hesitated and backed away as if he did not want to shoot but then began shooting. She said Kneeland and Barry Smith pushed open the door, stood in front of the door, and shot into the house. She said that she was standing in the middle of the living room when she saw them shooting and that she knew them from the neighborhood.

Ms. Irby testified that Defendants Kneeland and Barry Smith stood beside each other in the doorway, that Kneeland was on the right, and that Barry Smith was on the left. She said that Kneeland paced the front porch when her aunt, Cynthia Gray, yelled that children were inside but that after he stopped pacing, he began shooting again. She said that Kneeland acted as if he was under pressure and did not want to "let his home boys down" but that Barry Smith did not care and continued shooting. She said she did not see them reload their guns but heard two pauses in the shooting. She said she did not see anyone other than Kneeland and Barry Smith with guns that day.

Ms. Irby testified that she remained in the closet until the police arrived. She said that an ambulance came to the scene and treated her wound and that she did not go to the hospital for treatment. She said the shooting lasted about forty-five minutes to one hour. She said that she did not remember the type of gun Defendant Barry Smith used and that she was distraught and scared.

Ms. Irby testified that she made a statement and identified each Defendant in a photograph lineup at the police station. At the trial, she identified Defendant Barron Smith as Fat and said he was Defendant Barry Smith's twin brother. She said she did not see Barron Smith at the door shooting but saw him in the car as it approached. She said that she was on the porch when she saw the car approaching but that she ran inside after she heard gunshots. She said she did not see anyone with a gun when she heard the first shots. She said all three Defendants were in the car when it approached.

Ms. Irby testified that a baby carrier was on the porch and that an eight-month-old baby had been in the carrier when she saw the Defendants' car approached. She said that the baby's father was her cousin, Ebony Payno, and that she grabbed the baby and ran inside when the shooting began. She said Defendants Kneeland and Barry Smith never came through the door but stood at the door.

On cross-examination, Ms. Irby testified that she sat on the porch about five minutes before she heard gunshots. She said seven to ten people were outside and fifteen to twenty people were inside. She said that she ran inside and that when she reached the center of the living room, she heard more shots, which she thought were coming from the back of the house but was unsure. She said she saw Martha Gray inside the house on the left side coming from the kitchen. She said she did not see anyone in the house with a gun or hear any member of her family shooting. She agreed she was related to most of the people in the house.

Ms. Irby testified that she was not in the closet for the entire forty-five minutes of shooting. She said she came to the courthouse each day during the trial and sat in the witness room with others who were testifying. She agreed that the people in the witness room were her family members but denied talking about the case.

Ms. Irby testified that she went to the police station after the shooting, gave a statement, and viewed photograph lineups. She said that although she did not see Defendant Barron Smith shooting, she identified him in a photograph lineup and wrote on the lineup that he and his twin brother "shot up" her aunt's house.

Ms. Irby testified that Defendants Kneeland and Barry Smith pointed their guns in the house but not at her. She said that people drank beer at the family barbecues but that she had not had anything to drink. She reviewed her statement to the police and agreed she wrote that she saw Defendants Barry Smith and Barron Smith enter through the back and that she did not see Kneeland. She said, though, that she saw Kneeland when she left the closet after she heard the pause in the shooting and went to the front room. Referring to the dates on the photograph lineups, she said that she identified Barron Smith and Barry Smith on August 8, 2009, and identified Kneeland on August 12, 2009. She said she had known Kneeland for years through mutual friends in the neighborhood and had been at the house with him many times. She said the police called her after her initial statement and asked her to identify Defendant Kneeland, but she did not remember the specifics of the conversation. She said she did not remember what the Defendants wore the day of the shooting but knew that Kneeland had a black shirt wrapped around his face.

Ethel Gray testified that she was at her aunt's house on August 8, 2009, preparing for a barbecue and that she had an altercation with Kentetra Matthews, who "used to go with Skinny." She said that five or ten minutes after the altercation, a gray car pulled up to where Ms. Matthews was standing and that Defendants Barry Smith, Barron Smith, and Kneeland were in the car. She thought "Kenisha" pulled a gun from her shirt and passed it to Barry Smith.

-7-

Ms. Gray testified that she saw Defendant Barron Smith step out of the car when Defendant Barry Smith was driving. She said that her cousin grabbed her young nephew, who was on the porch, and that she ran inside looking for somewhere to hide because she was scared they were about to start shooting. She said more than twelve or thirteen people were in the house, including Martha, her aunt Faith, her cousin Tonya, her son Cavion, her nieces Micia Allen and Tonia Allen, Tonya Gray, her uncle Moon, and her uncle Dale. She said that she ran to a bedroom and hid under a bed against a wall, that her son hid in the drawer of a dresser in the same bedroom, and that her cousin Herman, Lantondra, and Ms. Irby were in the bedroom hiding with her. She said she saw Ms. Irby get wounded in the buttocks. She said that the shooting lasted about fifteen minutes and that the police and an ambulance came to the scene. She said that the shooting ended when the Defendants used all their bullets and that she did not know where they went after they finished shooting.

Ms. Gray testified that she gave a statement to the police about the shooting and viewed photograph lineups. She said that she identified Defendant Barron Smith in one photograph lineup and that her writing stated she saw him shoot. She identified Defendant Barry Smith and Defendant Kneeland in two other photograph lineups. She saw Barron Smith standing inside the front door shooting a gray gun, Kneeland in the car, and Barry Smith driving the car but not in the house shooting.

Ms. Gray testified that about five minutes elapsed between the time she saw Defendants Kneeland and Barry Smith in the car and the time the shooting began. She said that they got out of the car and started shooting and that she ran and hid because she was terrified. She said bullets were coming from every angle of the house. She said that none of her family had guns and that she did not have a weapon. She identified a picture of her aunt's house with a baby car seat on the front porch and said the baby was in the seat when the Defendants arrived.

On cross-examination, Ms. Gray testified that at the time of the shooting, she did not know Defendants Barron Smith and Barry Smith's given names. She said that the Defendants' car stopped beside the bushes in front of her aunt's house, that she was sitting in the middle of the front porch, and that she ran inside before the shooting began. She said that by the time she was able to get inside, shots were being fired. She said that the five people on the porch ran inside when she did and that about twelve people were already inside.

Ms. Gray testified that she had heard Defendant Barron Smith's name but that she knew him only as "Fat." She said she wrote "Barron Smith" on the photograph lineup after she saw the name tattooed on her cousin, who had previously dated him. She said that the Defendants drove a gray car, that Defendant Barry Smith was driving, that Barron Smith was

sitting on the front seat, and that Defendant Kneeland was on the back seat. She said that Barron Smith jumped out of the car and came to the front door and that she never saw Barry Smith or Kneeland at the front of the house. She said she was near Ms. Irby throughout the incident. She said she heard more than ten shots but agreed that the statement she gave to the police showed she heard six to eight shots.

Ms. Gray testified that after the shooting, she stayed at her aunt's house until the police arrived. She said that she did not remember anyone moving the chairs from the front porch but that they were probably moved when everyone ran from the porch. She said the baby carrier was the only thing left on the porch. She said that Defendant Barry Smith was driving and that he never said anything to her or anyone else to her knowledge. She said that Kenisha was on the backseat in the car with the Defendants and that she saw Kenisha pass Defendant Barry Smith a weapon when the car stopped in front of the house. She said that when she saw the car approach, she told everyone on the porch the Defendants were about to shoot, that shooting began as soon as she made the statement, and that everyone on the porch ran in the house. She said that her cousin grabbed the baby and that she helped her two nieces, her nephew, and her son run in the house. She said she did not see anyone shooting before she ran inside. She admitted she and the others in the house talked about what happened that day.

Ms. Gray testified that the shooting occurred around 1:00 p.m. and lasted until about 1:15 p.m. and that the police arrived around 1:30 p.m. She said the ambulance came to treat her cousin, Ms. Irby, who was also known as Erica Harris. She said that Cynthia Gray, also known as Becky, was on the porch with her and that Martha Gray was in the house. She said that the Defendants' car came toward the front of the house and that the tree in the front yard did not block her view of the car.

Ms. Gray testified that she did not know who was in the living room when she ran into the house. She said that she hid under one of the beds in the bedroom and that her cousin Marico hid under the other bed. She said she could see the front door from her position under the bed and saw Defendant Barron Smith shooting.

Ms. Gray testified that she told the police that Defendant Kneeland had been shooting but agreed his name was not in her written statement to the police on the day of the incident. She said that she told the police four people were in the car and that she identified Defendants Barron Smith and Barry Smith. She said that she did not know Kneeland's name but that she told the police she could recognize him in a photograph lineup.

Ms. Gray testified that she went to the police station four days after the shooting to give another statement and to identify Defendant Kneeland in a photograph lineup. She said

that each time she gave a statement, the police typed the statement and that she signed it. She said she did not see Kneeland with a gun or see him shooting. She said she saw him in the car but did not see him get out.

Cynthia Gray testified that she was at her sister's house preparing for a barbecue on August 8, 2009, and that her nephew, Darryl Gray, had a "real heated" argument with Defendant Barron Smith. She said that she went into the house because she thought the argument was becoming "confrontational" and that Barron Smith left in a gray car, which she saw circle the block twice as she stood in the doorway. She said that the third time the car circled, two men got out of the car and that she went to the back of the kitchen and laid on the floor. She said she was on the floor about four minutes when the first shots were fired through the side door window. She said that a few minutes later, Barron Smith came through the door and kept shooting "like he owned the place" and that Defendant Barry Smith was standing near the driveway shooting. She said that after she saw Barron Smith come in the door, she crawled to the other side of the door and that she was scared for her life. She said that he emptied his gun and left. She said that she stood up and tried to leave through the back door but that someone she could not see was shooting in the back. She said she returned to the floor and crawled to look out a window. She said that she saw Defendant Kneeland shooting on one side of the house and that he ran and got into a gray car. She named thirty-five people who were in the house, including Ethel Lynn and her brother Darryl Gray, who were both listed as victims in the indictment, and said a lot of children were there.

Ms. Gray testified that the shooting lasted twenty to twenty-five minutes and that she did not have a weapon. She said that many people called 9-1-1 and that she called and told the dispatcher to send the police quickly because children were in the house. She said her niece, Erica Irby, was shot. She said the police wrote the victims' names and asked them what happened. She said she went with the police and gave a statement. She viewed two photograph lineups and identified Defendants Barron Smith and Barry Smith. She said that she did not know them personally and did not know their real names at the time but that she knew them because they visited her sister's house and were friends with her sister's children.

Ms. Gray testified that when the shooting stopped, she tried to check on everyone and that people were hiding everywhere. She said that Defendant Barron Smith's gun was black and silver, that Defendants Kneeland's and Barry Smith's guns were both black, and that all three guns were handguns. She said she did not see anyone in her family shooting at the Defendants. She said that after the shooting, she saw the Defendants run to their car and leave.

On cross-examination, Ms. Gray testified that she arrived at Martha Gray's house about 10:30 a.m. on August 8, 2009, and that everyone arrived about that time to bring food

and to prepare for the barbecue. She said that Erica Irby and Ethel Gray were already there and had brought her sister, who was Ms. Irby's mother. Although she was unsure, she said the shooting occurred around 2:45 or 3:00 p.m.

Ms. Gray testified that the altercation she saw was between Darryl Gray and Defendant Barron Smith. She recalled testifying previously that the altercation was between Darryl Gray and Defendant Barry Smith and said all three were arguing, "taking turns with each other." She said that she saw Barron Smith driving, that the car stopped down the street, that one of the Defendants got out of the car, went into a house, and jumped back into the car, and that the car circled the block twice before stopping again. She said three people got out of the car with guns in their hands but did not remember in which hand they held the guns. She said she ran to hide in the kitchen. She said that Barron Smith stood inside the house at the front door, that she saw Kneeland get out of the car before she took cover, and that she saw Barry Smith shooting in the driveway on the side of the house.

Reading from a statement she made August 8, 2009, at 8:36 p.m., Ms. Gray testified that she told the police that she arrived at the house about 3:00 or 3:30 p.m. and that she saw two men get out of the car. She agreed her previous statements were different from her testimony at the trial but said she was nervous that day because of the shooting. She said she was not familiar with guns. Reading again from her previous statement, she said she told the police that she saw a black .38 with a brown handle and a nine-millimeter gun. She said that she told the police she could have been wrong because she did not know guns well but that her uncertainty was not reflected in her statement. She said that her statement did not have information about Defendant Barron Smith's shooting a black and silver gun and that the statement did not contain many of the things she told the police.

Ms. Gray testified that Defendant Barron Smith was in the car when he and Darryl Gray were arguing and that she was sitting on the porch when she saw them. She said she did not see Mr. Gray display or shoot a gun. She said that more than twenty people were in the house at the time of the shooting, including babies, pregnant women, and her sick sister.

Ms. Gray testified that she was unsure who was driving the car when it passed the house as she was trying to take cover. She said she entered the house when the car parked and saw the Defendants leave the car with guns. She said that Defendant Barry Smith did not come into the house and that looking through a window after Defendant Barron Smith stopped shooting, she saw Barry Smith fire two shots. She said she did not tell the police she saw Barry Smith shooting and agreed the information was not in her statement. She said that the police must have left information out of her statement because a lot was happening and that she also could have left information out because she was shaken.

Ms. Gray testified that she had to stand up at the trial to see a photograph because it was of poor quality, not because of her eyesight. She said she was prescribed eyeglasses but did not wear them. She said that she was both farsighted and nearsighted but that she could see "pretty good." She said that she arrived at the barbecue about 10:30 a.m., not 3:30 p.m. as she told the police.

Ms. Gray testified that no one told her anything about the shooting, that she was there and saw it, and that she made a 9-1-1 call. She said she viewed the photograph lineups and told the police she could identify the shooters. Her statement said that she identified Defendants Barron Smith and Barry Smith and that she was "120 percent" sure of their identity. She said that she told the police that if they showed her a photograph, she could identify the third shooter but that she did not know his name at the time. She admitted someone told her his name. She said two Tashas were at the house, Tasha Gray and another Tasha, who was Shell's friend. She said she did not know Defendant Kneeland's name but knew who he was because his father ran a church close to where she previously lived and because she was a school parent where he attended school. She said Kneeland wore blue jean shorts and a white t-shirt with a black shirt draped over his neck the day of the shooting.

Eddie Heaston, a 9-1-1 dispatcher and the keeper of records, testified that every 9-1-1 call was recorded from the time the line was answered until the call was disconnected. He agreed his office had a business duty to record the calls and said the call recordings were kept for eighteen months unless a request was made to hold them longer. He agreed the recordings were kept in the course of regularly conducted 9-1-1 operator and office business activity. He identified and said he had listened to the full recording of the calls received on August 8, 2009, beginning at 5:08 p.m., from the same location as the shooting. He identified a "slightly edited" version of the recording, which he had heard, and it was played for the jury.

On cross-examination, Mr. Heaston testified that all the calls originated from cell phones in the area of the address of the shooting. He said that during one of the calls, the caller said someone at the house had called her, told her about a shooting, and asked her to call 9-1-1 and that the dispatcher typed that the call was from a woman at an address on the same street as the shooting. He said, though, that the cell phone towers gave the vicinity of a call, not the exact address.

The 9-1-1 recording contained multiple calls from different people. Several people were screaming but much of the communication was indiscernible. The first female caller asked for the police because someone was shooting. A male caller gave the intersection where the house was located. A female caller gave the address of the house and her phone number to the ambulance dispatcher and said someone had been shot but would not answer

questions. Another female caller gave the address of the house, and another caller reported that a female victim had been shot. Tasha Allen called 9-1-1, requested police, and said someone called and told her that "Fat" shot at her aunt's house and that her cousin had been shot. She said she was not there but someone had called her. A male caller requested the police and an ambulance and said his female cousin had been shot and was bleeding from her buttocks.

Upon this evidence, Defendants Baron Smith, Barry Smith, and Kneeland were each convicted of eight counts of aggravated assault, one count of reckless endangerment committed with a deadly weapon, eight counts of reckless endangerment, and one count of aggravated criminal trespass. *See* T.C.A. §§ 39-13-102, 39-13-103, 39-14-406. The trial court merged the eight counts of reckless endangerment with the eight counts of aggravated assault. Defendant Barry Smith received an effective ten-year sentence. Defendant Barron Smith received an effective fourteen-year sentence. Defendant Julian Kneeland received an effective eight-year sentence. This appeal followed.

# I

The Defendants contend that the evidence is insufficient to sustain their convictions. They assert that the evidence is insufficient to establish their identity as the shooters because the witness testimony was inaccurate and contradictory. They also assert that the evidence did not show six of the eight victims named in the indictment were placed in fear of imminent bodily injury. They argue that the victims in Counts 13, 17, 21, 29, 33, and 37 did not testify and that the witnesses who did testify did not state that the other six were in fear of imminent bodily injury. The State counters that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App.

1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this appeal, aggravated assault occurs when a person "[i]ntentionally or knowingly commits an assault . . . and . . . [c]auses serious bodily injury to another [or] [u]ses or displays a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(i)-(ii) (2010). An assault occurs when a person "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" *Id.* at § 39-13-101(a)(1)-(2) (2010). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* at § 39-11-302(b) (2010). "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." *Id.* at § 39-11-301(a)(2) (2010). "[A] person . . . acts intentionally with respect to the nature of the conduct or to a result of conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* at § 39-11-302(a).

Reckless endangerment is committed when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a) (2010). Reckless endangerment is a Class A misdemeanor unless it is committed with a deadly weapon, in which case it is a Class E felony. *Id.* at § 39-13-103(b)(1)-(2).

Aggravated criminal trespass occurs when a person "enters or remains on property when: (1) [t]he person knows the person does not have the property owner's effective consent to do so; and (2) [t]he person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another[.]" T.C.A. § 39-14-406(a)(1)-(2) (Supp. 2013). "Enter" means "intrusion of the entire body." *Id.* at 39-14-406(b). When the aggravated criminal trespass is committed in a habitation, it is a Class A misdemeanor. *Id.* at § 39-14-406(c).

**A. Identity**

With regard to the Defendants' argument that the testimony about their identities was insufficient, we acknowledge that the evidence was conflicting. The duty of the jury, as the trier of fact, was to resolve those inconsistencies by crediting the evidence worthy of belief and discrediting the evidence that was less trustworthy. On appeal, the defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913,

914 (Tenn. 1982). The appellate court resolves all conflicting testimony in favor of the jury's verdict and the trial court's judgment. *Id.*

In the light most favorable to the State, each of the eye witnesses identified the Defendants at the trial and in photograph lineups after the shooting. Although on cross-examination she denied seeing the shooters, Martha Ann Gray identified the Defendants as the shooters during direct examination and in photograph lineups and was familiar with them because they had been to her house, eaten, and stayed the night. Darryl Gray argued with Defendants Barry Smith and Barron Smith shortly before the shooting, and the Defendants left in a gray car with Barron Smith driving. They circled the block twice before stopping down the street where one Defendant got out, went inside a house, and returned to the car. The car continued and stopped in front of the house where the shooting occurred. Ethel Gray saw the Defendants arrive at the house in a gray car with Barry Smith driving, Barron Smith on the front seat, and Defendant Kneeland on the back seat and saw a weapon passed to Barry Smith. Cynthia Gray saw three people leave the car with guns in their hands and described the Defendants' guns. Ethel Gray and Cynthia Gray saw Barron Smith enter through the front door shooting. Although Erica Irby denied seeing Barron Smith at the door shooting, she saw him in a silver car with Kneeland and Barry Smith as it approached the house. Cynthia Gray saw Kneeland get out of the car before she took cover, saw him shooting on one side of the house, and saw him get into a gray car after he finished shooting. She also saw Barry Smith shooting in the driveway on the side of the house. Erica Irby saw Kneeland and Barry Smith standing in front of the door shooting into the house when she was standing in the middle of the living room.

Although inconsistencies exist in the witnesses' statements to the police and their testimony at the trial, the record shows that approximately thirty bullet holes were found inside the house, that the shooting lasted from ten minutes to one hour, and that all three Defendants were seen at the house during the shooting with guns. We conclude that a rational trier of fact could have resolved the conflicts in favor of the State and found that the Defendants were the shooters.

### B. Fear of Imminent Bodily Injury

"The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." *State v. Gregory Whitfield*, No. 02C01-9706-CR-00226, slip op. at 4 (Tenn. Crim. App. May 8, 1998), *perm. app. denied* (Tenn. Dec. 7, 1998). "A victim's fear of imminent bodily injury may be proven with circumstantial evidence." *State v. Jessie James Austin*, No. W2001-00120-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App. Jan. 25, 2002) (concluding that although only one victim testified, circumstantial evidence was

sufficient to show that the defendant's actions caused both victims to reasonably fear imminent bodily injury), *perm. app. denied* (Tenn. July 15, 2002); *see also State v. Harry Jamieson*, No. W2003-02666-CCA-R3-CD, slip. op. at 9 (Tenn. Crim. App. Dec. 23, 2004) (concluding that the evidence was sufficient to infer that two victims who did not testify reasonably feared imminent bodily injury when another witness testified that the defendant confronted the victims with a gun, ordered them to the floor, and pointed the gun at the two victims, who were hysterical as they lay face down on the floor during the robbery).

In the light most favorable to the State, the evidence shows that Erica Irby, Ethel Gray, Lantandra Harris, Mario Gray, Darryl Gray, Dercedes Gray, and Cavion Gray, who were the victims in Counts 5, 9, 13, 17, 29, 33, and 37, were in the house when the Defendants were shooting. Erica Irby hid in a closet during the shooting and was struck by a bullet. Ethel Gray ran and hid under a bed because she was scared and saw Ms. Irby get shot. Lantandra Harris hid in the same bedroom as Martha Ann Gray and Ethel Gray and in the closet with Erica Irby. Martha Ann Gray said Mario was at her house that day. Darryl Gray was on the porch with others when Ms. Irby arrived for the barbecue, and Cynthia Gray saw him at the house. Dercedes Gray came from the back of the house toward the front during the shooting when Ms. Irby was hiding in the closet. Ethel Gray's son, Cavion, hid in a drawer of a dresser in the bedroom.

The witnesses who were inside the house at the time of the shooting testified that they were scared. Martha Ann Gray said that she feared for her life and was "scared to death" as she hid on the floor. She said everyone ran into the house and hid when the shooting began. During the shooting, she heard "hollering, bullets, people screaming, [and] bullets flying from every angle." She called 9-1-1 when she was lying on the floor and heard others in the house calling 9-1-1. Ms. Irby testified that she was distraught and scared because she had never been in a similar situation and that bullets came from everywhere. She said that when she arrived, about ten people were outside and that they ran inside the house when they heard gunshots. Ethel Gray said that she ran inside and hid because she was terrified the Defendants were about to start shooting and that bullets came from every angle of the house. Cynthia Gray said she was scared for her life. Officer Wilson said the scene was chaotic when he arrived. Officer Ellis found approximately thirty bullet holes inside the house, collected eight shell casings and two bullet fragments inside, found blood on the floor, and collected eight spent shell casings on the sidewalk in front of the house, one spent shell casing in the front yard near the porch, and another spent shell casing in the front wall of the house.

This court has concluded that fearfulness may be shown by a concern for self-defense, the inability to concentrate, and turning to the police for help. *See State v. Tommy Arwood, Jr.*, No. 01C01-9505-CC-00159, slip op. at 6 (Tenn. Crim. App. May 24, 1996); *see also*

*State v. Jamie John Schrantz*, No. W2002-01507-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App. Dec. 2, 2003). Although the record does not show any self-defense was attempted, self-preservation was. The record reflects that Erica Irby, Ethel Gray, Lantandra Harris, Mario Gray, Darryl Gray, Dercedes Gray, and Cavion Gray all hid inside the house during the shooting. Martha Ann Gray called 9-1-1 for help and heard others do the same. The witnesses who testified at the trial said they feared for their lives. We conclude that the circumstances of the incident would reasonably cause the victims in Counts 5, 9, 13, 17, 29, 33, and 37 to fear imminent bodily injury and that the evidence is sufficient as to these counts.

Regarding the Defendants' argument that the record does not show Autumn Allen, the victim named in Count 21, was in the house, we find no evidence that Ms. Allen was present during the shooting. Ms. Allen did not testify, and nothing in the record shows she was there. A rational trier of fact could not have found the essential elements of aggravated assault upon Ms. Allen without evidence of her presence at the house where the shooting occurred. The Defendants' convictions for aggravated assault against Autumn Allen are reversed, and the charge is dismissed.

## II

The Defendants contend that the trial court erred in allowing the jury to hear the 9-1-1 recording over their hearsay objections. The State responds that the court properly allowed the evidence.

During the trial, a jury-out hearing was held to determine whether the 9-1-1 recording would be admitted as evidence. The prosecutor sought to introduce the recording as a business record. The Defendants objected, contending that the recording was hearsay. They argued that an authentication issue existed because the recording was a "convolution" of 9-1-1 recordings and that it was unclear who was making the statements during portions of the recordings. The State responded that the recording was admissible hearsay under Tennessee Rule of Evidence 803 because it is a record of a regularly conducted business activity and that one of the State's witnesses, the 9-1-1 supervisor, could identify the dispatchers in the recording. Defendant Barron Smith responded that authentication of the dispatchers was not the issue but rather the identification of the callers.

After listening to the recording, the trial court determined that the "individuals involved were really suffering from the incident[.]" The court stated that the callers sounded scared and that chaos and screaming were audible. It found that the recording satisfied "all the requirements" and that the declarants were operating under the excitement of the events. The court overruled the objections and ordered the statements about an earlier shooting at the

-17-

house be redacted. Defendant Kneeland renewed his hearsay objection before the tape was played for the jury. The court found that "besides the business act, [the calls] are excited utterances" and allowed the tapes to be played as an exception to the hearsay rule.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. One exception to the hearsay rule is for an excited utterance, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* at 803(2). Our supreme court has stated three prerequisites to admission pursuant to the excited utterance exception:

> The first requirement is "a startling event or condition" that "'suspend[s] the normal, reflective thought processes of the declarant.'" *State v. Stout*, 46 S.W.3d 689, 699 (Tenn. 2001) (quoting *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997)) (other internal quotations omitted) [(abrogated by statute on other grounds as stated in *State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004))]. Second, the statement must "relate to" the startling event or condition. *Id.* This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." *Gordon*, 952 S.W.2d at 820 (quotation omitted); [Neil P.] Cohen et al., [*Tennessee Law of Evidence*] § 8.07[3][c] at 8-76 [(5th ed. 2005)]. The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." *Stout*, 46 S.W.3d at 699-700. This requirement considers a variety of factors, including the interval of time between the startling event and the statement. *Id.* at 700.

State v. Franklin, 308 S.W.3d 799, 823 (Tenn. 2010) (footnotes omitted). The "ultimate test" for determining the admissibility of an excited utterance is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

The qualifying startling event occurred when the Defendants shot handguns at the house where a group had gathered for a family barbecue. Testimony at the trial established that the people at the house ran to hide when the shooting began. The witnesses at the trial testified that they were scared for their lives. In the 9-1-1 recording, the callers screamed and

cried. The statements in the recording related to the startling event because they described the location of the shooting, what happened, and who was injured. Mr. Heaston testified that the calls originated from cell phones at the address of the shooting on the day of the shooting. The callers made the statements while "under the stress or excitement from the event or condition" because they called 9-1-1 during or immediately after the shooting. Although testimony varied about the time of the shooting, all witnesses agreed that the shooting occurred sometime in the afternoon on August 8, 2009. The 9-1-1 calls began at 5:08 that afternoon. Cynthia Gray testified that she called 9-1-1 around the time of the shooting. Martha Ann Gray called 9-1-1 while she was hiding on the floor during the shooting. They both heard others in the house calling 9-1-1.

Regarding the statements made on the 9-1-1 recording by Tasha Allen, who was not at the house but was told by someone at the scene that a shooting had occurred, there are two levels of out-of-court statements involved: (1) Ms. Allen's statements to the dispatcher and (2) the unknown caller's statements to Ms. Allen that shooting had occurred at her aunt's house and that Defendant Barron Smith was one of the shooters. As stated above, the unknown caller's statements to Ms. Allen qualified as excited utterances. However, Ms. Allen's statements to the dispatcher relayed information she received from a third party, and she lacked personal knowledge of the matter.

"The only competency requirement for an excited utterance under Rule 803(2) is that the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." *State v. Land*, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). An excited utterance is inadmissible if the declarant lacked personal knowledge. *Id.* Rule 603 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Personal knowledge may be inferred from the statements and the surrounding facts and circumstances. *Land*, 34 S.W.3d at 529. "[T]he party offering the testimony must introduce sufficient evidence to support a jury finding that the witness had personal knowledge of the matter." *Id.* No evidence in the record shows that Ms. Allen had personal knowledge that her aunt's house or her cousin were shot. The State failed to show that Ms. Allen either saw or otherwise perceived the shooting, and the record suggests she did not.

The trial court did not err in admitting the 9-1-1 recording as an excited utterance but erred in admitting Ms. Allen's portion of the recording because she lacked personal knowledge of the events. We conclude, however, that the error was harmless. *See* T.R.A.P. 36(b). The other callers, who were at the house during the shooting, told the dispatchers information similar to that Ms. Allen relayed. Further, the evidence at the trial corroborated the information.

-19-

## A. Defendant Barry Smith

Defendant Barry Smith argues that the discernable portions of the recording were irrelevant and played upon the emotions of the jury. The State argues that the issue is waived because the Defendant did not object to relevancy at the trial. In the alternative, it argues that the court did not abuse its discretion in admitting the tape and that the Defendants were not prejudiced.

Generally, relief is unavailable to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). A party may not assert one basis for excluding evidence at the trial and a different basis on appeal. *State v. Adkisson*, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994). Because Defendant Barry Smith failed to make a contemporaneous objection to the admission of the 9-1-1 recording on any basis other than hearsay, he has waived his issue concerning the recording's relevance. *See* Tenn. R. Evid. 103(a)(1).

## B. Defendant Barron Smith

Defendant Barron Smith argues that Tasha Allen's 9-1-1 call was not an excited utterance because she stated she was not at the house where the shooting occurred and that her call was prejudicial, not harmless, because she was the only caller to name him as a shooter. He also argues that the 9-1-1 recording was not properly authenticated because it was admitted under the excited utterance exception, that the State only authenticated it as a business record, and that the callers and the dispatchers were not identified.

Regarding Ms. Allen's 9-1-1 call, as we discussed above, the trial court erred in admitting Ms. Allen's portion of the recording. Although Ms. Allen was the only caller to identify one of the shooters by the name "Fat," Martha Ann Gray, Ethel Gray, and Cynthia Gray identified Defendant Barron Smith by his nickname, "Fat," at the trial and testified that he was one of the shooters. The error was harmless. *See* T.R.A.P. 36(b).

Regarding Defendant Barron's argument that the hearsay statements were not authenticated as excited utterances, we acknowledge that pursuant to Rule 901(b)(5) the voices on the 9-1-1 tape could be identified "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Tenn. R. Evid. 901(b)(5). We note, though, that this provision of Rule 901 is an illustration only, not a limitation. *Id.* The rule provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Once this foundation is presented, the "'trier of fact then makes the ultimate decision

of whether the item is actually what it purports to be.'" *State v. Hinton*, 42 S.W.3d 113, 127 (Tenn. Crim. App. 2000) (quoting Cohen et al., § 901.1 at 613 (3d ed. 2005)).

Eddie Heaston testified that he was the custodian of the 9-1-1 recording. He explained that the calls were recorded from the time the line was answered until the call was disconnected and said the call recordings were kept for eighteen months. Before the recording was played for the jury, he stated that he had listened to the recording of the calls, that the calls were from August 8, 2009, and that the first call was made at 5:08 p.m. that day. He stated during cross-examination that all the calls originated from cell phones in the area of the address of the shooting. We believe that this evidence was sufficient for the trial court to determine that the jury could find that the recording was of the 9-1-1 calls made concerning the shooting on August 8, 2009. The jury was then free to determine whether the recording was of the 9-1-1 calls involved in this case and the weight it should receive.

### C. Defendant Julian Kneeland

Defendant Kneeland argues that contrary to the trial court's ruling, the business record exception is inapplicable to the 9-1-1 recording. He also argues that the trial court's failure to consider whether the declarants had personal knowledge was an abuse of discretion, that the statements were irrelevant, and that the recording was prejudicial.

Regarding the argument that the business record exception is inapplicable to the 9-1-1 recording, we agree. To the extent the State argued and the trial court found that the 9-1-1 recording should be admitted pursuant to the business records exception to the hearsay rule, the recording does not qualify for admission pursuant to that rule. *See* Tenn. R. Evid. 803(6). The business records exception to the hearsay rule "specifically requires that the declarant have 'a business duty to record or transmit' information." *Id.*, Advisory Comm'n Cmts. Because the callers in the recording were the declarants of the statements, not the 9-1-1 supervisor or operators, who had a business duty, the recording would not have been admissible under the business records exception. *See Tony A. Phipps v. State*, No. E2008-01784-CCA-R3-PC, slip op. at 12 (Tenn. Crim. App. Oct. 11, 2010) (concluding that an audio recording of a 9-1-1 call did not qualify for admission through the business records exception to the hearsay rule because the declarant did not have a business duty to record or transmit the information). In any event, the recording was properly admitted under the excited utterance exception to the hearsay rule as stated above.

Regarding Defendant Kneeland's argument that the trial court failed to consider the declarants' personal knowledge, "[t]he only competency requirement of an excited utterance under Rule 803(2) is that the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." *Land*, 34 S.W.3d at 529. The personal knowledge

requirement applies to excited utterances. *State v. Stanley Phillip Chapman*, No. W2004-02404-CCA-R3-CD, slip op. at 22 (Tenn. Crim. App. Nov. 2, 2005), *perm. app. denied* (Tenn. Mar. 27, 2006).

The trial court found that the "individuals involved were really suffering from the incident," that "something horrible had happened at the house," and that the recording satisfied "all the requirements." Mr. Heaston's testimony shows that the calls were made on the day and at the time of the shooting. A victim described by some of the callers as a cousin was shot in her buttocks, and Ms. Irby, who was the cousin of many of the people in the house, was shot in her buttocks. The record reflects that the court found the phone calls were based on personal knowledge. The records supports the trial court's findings.

Regarding Defendant Kneeland's argument that the 9-1-1 recording was irrelevant, relief is unavailable to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). A party may not assert one basis for excluding evidence at the trial and a different basis on appeal. *Adkisson*, 899 S.W.2d at 635. Because Defendant Kneeland failed to make a contemporaneous objection to the admission of the 9-1-1 recording on any basis other than hearsay, he has waived his issue concerning the recording's relevance. *See* Tenn. R. Evid. 103(a)(1). We conclude that the trial court did not abuse its discretion.

### III

The Defendants contend that the trial court erred in several ways during sentencing. The State contends that the court properly sentenced the Defendants.

At the sentencing hearing, Defendant Barry Smith chose not to make a statement. His family was present at the sentencing hearing to support him. Counsel said that the family and Barry Smith were cooperative with him in getting the matter resolved and that he thought Barry Smith regretted what happened. Counsel also stated that although Barry Smith was in town at the time of the shooting, he had been away at school on a basketball scholarship before he was arrested.

Defendant Barron Smith stated that he was sorry about what happened to the Gray family and that he was not a violent person. He said that he had seven- and ten-year-old daughters and that he needed to be released to be with them because he loved being a father. He said he attended school in Arkansas and did not get into trouble. He said that he had a drug conviction when he was eighteen years old, that he did not know much about the law then, and that he "took the first thing so [he could] get back out" because he had a child. He said that he did not commit the crimes the State alleged but that the jury convicted him. He

said that he had been incarcerated for two years, that he needed to get out of jail, and that his incarceration was hurting his "folks." He said the basketball coach at LeMoyne-Owen Community College wanted him to re-enroll in school and participate in the basketball program. Four of Barron Smith's family members were in the courtroom to support him during sentencing.

Defendant Kneeland stated that he understood the jury convicted him but that he was not the person the State portrayed because if he were, he would have had a record before the current convictions. He said he had two daughters and a family willing to support him. He said he was trying to return to his life. He apologized for the situation with the Gray family. The court read nine letters of support for Kneeland, and his father, stepmother, and other family members were in the courtroom to support him during sentencing. Counsel stated that a job was available for Kneeland should the court sentence him to probation.

Ms. Irby testified that the incident had a tremendous impact on the life of her family. She said that she knew the Defendants were not bad or violent people but that they should be held accountable for their actions. She said the Defendants knew what they were doing when they chose to use guns that day. She said her family moved from the neighborhood after the shooting. She said that she lived with the incident everyday and that it was "by the grace of God" that she was still alive. She said that she was shot and that she did not think justice was being served.

The trial court noted that the offense was a "bad one" and that it was "mindful" of the victims' testimony. It stated that the Defendants continued to deny the charges but that a jury had convicted them. The court found that the Defendants "really show[ed] a total disregard for the value of human life," that the facts of the case were "horrific," and that the offenses were "an act of terrorism, human terrorism." The court also noted "the extreme nature of the offenses."

In enhancing the Defendants' sentences, the trial court applied enhancement factor (10) because the offenses involved victims other than those named in the indictments. T.C.A. § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high."). It found that although the factor did not apply to aggravated assault convictions when the victims were each identified in the indictment, the factor was applicable when there were victims who were not named in the charges. The court found that ten victims were identified in the indictments and that the trial testimony showed more than ten people were in the house, including children and adults.

The trial court applied enhancement factor (8) to Defendant Barron Smith's sentence because he was on probation at the time he committed the present offenses. T.C.A. § 40-35-

114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community."). The court found that "this enhancement factor is applicable when the defendant is being sentenced for a crime committed while on probation or some other form of sentencing involving release in the community."

In determining consecutive sentencing was appropriate, the trial court relied on the facts as presented by the victims and credited by the jury's verdict. The court found that the Defendants were dangerous, that their behavior indicated no regard for human life, and that they showed no hesitation about committing a crime where the risk to human life was high. It determined that the sentences without consecutive sentencing were "inadequate" and that consecutive sentencing related to the seriousness of the offenses involved.

In denying probation, the trial court reviewed the enhancement factors, presentence reports, facts and circumstances of the offenses, criminal history, and expectation of rehabilitation. The court relied on the Defendants' backgrounds and found the facts of the offenses were "just too extreme." The court noted the offense was "another one of those cases involving gun violence in our neighborhood" and found probation would depreciate the seriousness of the offenses and would not provide deterrence.

The trial court sentenced Defendant Barry Smith as a Range I, standard offender to five years for each aggravated assault conviction, one year for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction. The court sentenced Defendant Barron Smith as a Range II, multiple offender to seven years for each aggravated assault conviction, three years for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction. The court sentenced Defendant Kneeland as a Range I, standard offender to four years for each aggravated assault conviction, one year for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction. For each Defendant, the trial court merged the eight counts of reckless endangerment with the eight counts of aggravated assault and ordered Count 5 to be served consecutively to the remainder of the convictions, which were to run concurrently.

The Tennessee Supreme Court adopted the present standard of review for sentencing in *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). The length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708. In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or

-24-

statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

### A. Defendant Barry Smith

Defendant Barry Smith contends that the trial court erred in ordering two of his aggravated assault convictions to run consecutively. He argues that he is not a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4) and that the court failed to analyze whether consecutive sentencing was needed to protect the public or related to the severity of the offense.

In determining Defendant Barry Smith's sentence, the trial court found no previous felony convictions. The court noted that the presentence report showed he had four misdemeanor convictions, that he did not finish high school but earned his GED, and that he had listed one job, which could not be verified by the probation officer. The court applied enhancement factor (10). T.C.A. § 40-35-114(10). He received an effective ten-year sentence.

Regarding Defendant Barry Smith's argument that the trial court erred in ordering consecutive sentencing, the determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. *State v. Blouvet*, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states, in pertinent part, that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." *Id.* § 40-35-115(b)(4). Our supreme court

concluded that when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995); *see State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court noted the "horrific" facts and "the extreme nature of the offenses" and determined that consecutive sentencing related to the seriousness of the offenses involved. The record supports the court's findings that the nature of the offenses was extreme and consecutive sentencing was reasonably related to the severity of the offenses. *See Lane*, 3 S.W.3d at 461. Although the court made no specific finding that the public needed protection from Defendant Barry Smith's further criminal conduct, we conclude that the record supports the trial court's imposition of consecutive sentencing. After an argument between one of the Defendants and Darryl Gray, Barry Smith and his codefendants shot handguns multiple times into a house occupied by more than ten people, including young children, and struck one victim. His conduct warrants a finding that the sentences are necessary to protect the public. We determine that the record supports the imposition of consecutive sentences because Barry Smith is a dangerous offender, the sentences reasonably relate to the severity of the offenses, and the sentences are necessary to protect the public.

## B. Defendant Barron Smith

Defendant Barron Smith contends that the trial court erred in its application of enhancement factors. He also contends that the court erred in ordering two of his aggravated assault convictions to run consecutively because it did not consider public protection or the severity of the offense. He argues the court made its determination based on what could have happened instead of what actually happened.

In determining Defendant Barron Smith's sentence, the trial court found that he was a Range II, multiple offender because he had two previous felony convictions. The court applied enhancement factors (8) and (10). T.C.A. § 40-35-114(8), (10). The court noted that his presentence report included an inmate disciplinary report showing he was found guilty of assaulting another inmate while in jail, that he dropped out of school, that he had smoked marijuana but had allegedly quit, and that no employment information was provided. He received seven years for each aggravated assault conviction, three years for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction. The court ordered two of the aggravated assault convictions to run consecutively and the remainder of the convictions to run concurrently.

Defendant Barron Smith argues that the trial court erred in applying enhancement factor (10). He argues that high risk to human life and potential for bodily injury were inherent to the offenses of aggravated assault and reckless endangerment and could not be used to enhance his sentence. Enhancement factor (10) is generally inapplicable to an aggravated assault conviction because "there is necessarily a risk to human life and the great potential for bodily injury whenever a deadly weapon is used." *State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). However, this court has concluded that when factor (10) is inherent in the offense against the victim, it may apply if a person other than the victim was in the area of risk. *State v. Zonge*, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). The trial court found that ten victims were identified in the indictments and that the trial testimony showed more than ten people were in the house, including children and adults. The record supports the court's findings.

Defendant Barron Smith argues that everyone in the house was a victim named in the indictment because Count 42 identified the victims as "Martha Gray, Cynthia Gray, and the Children of the Gray family." The indictment says "children." The record shows that in addition to the named victims, other adults, not only children, were at the house during the shooting. Even if the description "children of the Gray family" was broadly interpreted to mean all those present who were part of the extended Gray family, Martha Ann Gray said that a child of a family friend hid in a dresser drawer. Cynthia Gray said that a woman named Tasha, who was "Shell's" friend, was at the house. Both of these victims are identified as friends, not members of the Gray family. The trial court properly applied factor (10).

Defendant Barron Smith argues that the trial court erred in applying enhancement factor (8) because his failure to comply with the conditions of a sentence was based on his being charged with the present offense. He argues that factor (8) should only apply when a defendant has failed to comply with a condition of a sentence involving a release into the community that is not the subject offense and that factor (13)(C) applies when the defendant commits an offense while on probation. *See* T.C.A. § 40-35-114(8), (13)(C) ("At the time the felony was committed, one (1) of the following classifications was applicable to the defendant . . . Released on probation").

Enhancement factor (8) contemplates a *previous* history of unwillingness to abide by the conditions of release status and, therefore, cannot be triggered solely by the commission of the offense for which the defendant is being sentenced. *State v. Hayes*, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995). The trial court improperly applied factor (8). However, enhancement factor (13)(C) specifically addresses the enhancement of a sentence for a felony committed while a defendant is on probation. Defendant Barron Smith concedes that factor (13)(C) applies. The court's misapplication of factor (8) does not invalidate the sentence

because other reasons consistent with the purposes and principles of sentencing support the within-range sentence. *See Bise*, 380 S.W.3d at 706.

Regarding Defendant Barron Smith's argument that the trial court erred in ordering consecutive sentencing, as noted above, the circumstances of the offense support the court's finding that Barron Smith is a dangerous offender whose behavior indicated little or no regard for human life and had no hesitation about committing an offense when the risk to human life was high. The record supports the court's finding that consecutive sentencing was reasonably related to the severity of the offenses, which is reflected in its determination that consecutive sentencing related to the seriousness of the offenses involved. *See Lane*, 3 S.W.3d at 461. Although the court made no specific finding that the public needed protection from Barron Smith's further criminal conduct, we conclude that the record supports the trial court's imposition of consecutive sentencing. As stated above, after an argument between one of the Defendants and Darryl Gray, Barron Smith and his codefendants shot handguns multiple times into a house occupied by more than ten people, including young children, and struck one victim. Further, according to an inmate disciplinary report in the record, Barron Smith assaulted another inmate while incarcerated for the current offenses, indicating he committed more violent acts. His conduct warrants a finding that the sentences are necessary to protect the public. We determine that the record supports the imposition of consecutive sentences because Barron Smith is a dangerous offender, the sentences reasonably relate to the severity of the offenses, and the sentences are necessary to protect the public.

### C. Defendant Julian Kneeland

Defendant Julian Kneeland contends that the trial court erred in enhancing his sentence under enhancement factor (10). He argues that risk to human life is inherent in the offense of aggravated assault and that although the factor applies to people other than the victims named in the indictment, Count 42 included "children of the Gray family." He argues that because the shooting occurred during a family barbecue, the people at the house were children of the Gray family and that no proof established that at least one person was not a family member and was in the zone of danger. He also contends that the court erred in ordering two of his aggravated assault convictions to run consecutively because he was a dangerous offender without making the required factual findings that consecutive sentencing was necessary to protect the public and related to the seriousness of the offense.

In determining Defendant Kneeland's sentence, the trial court found that he had several misdemeanor convictions, that he had finished high school and attended some college, and that he had held several jobs for various amounts of time. It took note of several letters of support it received on the Defendant's behalf. The court applied enhancement

factor (10). T.C.A. § 40-35-114(10). He received four years for each aggravated assault conviction, one year for the reckless endangerment committed with a deadly weapon conviction, and eleven months, twenty-nine days for each misdemeanor conviction. The court ordered two of the aggravated assault convictions to run consecutively and the remainder of the convictions to run concurrently.

Regarding Defendant Kneeland's argument that the trial court erred in applying enhancement factor (10), this court has concluded that when factor (10) is inherent in the offense against the victim, it may apply if a person other than the victim was in the area of risk. *Zonge*, 973 S.W.2d at 259. Ten victims were identified in the indictment, and trial testimony showed more than ten people were in the house, including children and adults, during the shooting. The language in Count 42 identifying the victims as "Martha Gray, Cynthia Gray, and the Children of the Gray family" does not preclude the application of factor (10). The record shows that in addition to the victims named in the indictment, other adults, not only children, were at the house and that at least two victims named in testimony but not in the indictment were identified as friends of the Gray family. The trial court properly applied enhancement factor (10).

Regarding Defendant Kneeland's argument that the trial court erred in ordering consecutive sentencing, we conclude that the court properly imposed consecutive sentences. As noted above, the circumstances of the offense support the court's finding that he is a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing an offense when the risk to human life was high. The record supports the court's finding that consecutive sentencing was reasonably related to the severity of the offenses. Although the court made no specific finding that the public needed protection from Kneeland's further criminal conduct, we conclude that the record supports the court's imposition of consecutive sentencing. After an argument between one of the Defendants and Darryl Gray, Kneeland and his codefendants shot handguns multiple times into a house occupied by more than ten people, including young children, and struck one victim. His conduct warrants a finding that the sentences are necessary to protect the public. We determine that the record supports the imposition of consecutive sentences because Kneeland is a dangerous offender, the sentences reasonably relate to the severity of the offenses, and the sentences are necessary to protect the public.

In consideration of the foregoing and the record as a whole, we affirm the Defendants' convictions except the aggravated assault convictions in Count 21, which we reverse and dismiss. We vacate the judgments for the remaining aggravated assault and reckless endangerment convictions and remand the case to the Shelby County Criminal Court for entry of a single judgment for each aggravated assault conviction, noting merger of the reckless endangerment convictions.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE